# PAVAN PARIKH
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

**ELECTRONICALLY FILED**
**July 1, 2026 09:44 AM**
**PAVAN PARIKH**
**Clerk of Courts**
**Hamilton County, Ohio**
**CONFIRMATION 1846100**

**B C** **A 2603513**

**vs.**

**PHOENIX GROUP HOME LLC DBA PATH BEHAVIORAL HEALTH**

## FILING TYPE: INITIAL FILING (IN COUNTY) WITH JURY DEMAND

## PAGES FILED: 76

EFR200

**IN THE COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**

| | |
|---|---|
| **B.C. and L.P.**, *on behalf of themselves and all others similarly situated,*<br>c/o The Lyon Firm, ALC<br>2754 Erie Ave.<br>Cincinnati, OH 45208<br><br>Plaintiffs,<br><br>v.<br><br>**PHOENIX GROUP HOME, LLC d/b/a PATH BEHAVIORAL HEALTH,**<br>c/o Marshal Lunt<br>902 Gallia Street<br>Portsmouth, OH 45662<br><br>Defendant. | Case No.<br><br>Judge<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs B.C. and L.P. ("Plaintiffs"), at all times relevant herein, have been patients of PHOENIX GROUP HOME, LLC d/b/a Path Behavioral Health ("Path" or "Defendant"), and utilized Defendant's website for a variety of healthcare services. Plaintiffs bring this class action against Defendant in their individual capacities and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions, their counsels' investigation, and upon information and belief as to all other matters, as follows:

1. Plaintiffs bring this case to address Defendant's unlawful practice of collecting, disclosing, and monetizing Plaintiffs' and Class Members' confidential personally identifiable information ("PII"), confidential health communications ("CMC"), and protected health information ("PHI") (collectively referred to as "Private Medical Information" or Private



E-FILED 07/01/2026 9:44 AM / CONFIRMATION 1846100 / A 2603513 / COMMON PLEAS DIVISION / IFIJ

Information) to third parties, including Google, Inc. ("Google"), without consent, through the use of tracking software that was implemented, configured, and embedded in Defendant's website.

2. Defendant is a community-based behavioral health organization that focuses on connecting mental health services with medical care and support that owns, controls, and operates a website www.pathihc.com (the "Website"). Defendant holds its Website out to the public, including Plaintiffs and Class Members, as a method of marketing its healthcare services and offering its patients access to a variety of online services.

3. Defendant is a HIPAA covered healthcare entity and thus its disclosure and use of Private Medical Information for marketing is tightly regulated. The United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

4. Defendant encourages its patients, including Plaintiffs and Class Members, to utilize the Website as a confidential means of searching for medical services, scheduling medical appointments with Defendant, completing registration forms, paying bills, and accessing online medical records.

5. Plaintiffs and Class Members had a reasonable expectation of privacy when utilizing the Website for healthcare services including when searching for specific health conditions, searching for specific physicians, scheduling medical appointments, completing registration forms, paying bills, and accessing the online My Chart portal.

6. Defendant owed its patients, including Plaintiffs and Class Members, multiple legal duties to protect the Private Medical Information it collected and stored through its Website. These duties included common law, contractual, and statutory duties to protect against the disclosure and misuse of Plaintiffs' confidential health and medical communications.

7. Although Plaintiffs are presently unaware of every type of pixel and tracking tool Defendant has implemented on its Website, Plaintiffs' pre-suit investigation, including the review of the publicly available .HAR source code files, revealed the presence of a collection of Google tools deployed on various sensitive pages of its Website, including the "Contact A Clinic" form and the condition specific webpages, as discussed in detail below.

8. As used herein, the term "Tracking Tools" includes Google Analytics, the Google Tag Manager, and similar tools offered by Google in conjunction with its marketing products and other platforms (such as "DoubleClick" and "YouTube").

9. The Tracking Tools' specific purpose is to provide website owners with the ability to acquire the raw web user data and to then transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. The Tracking Tools are offered for "free" to companies like Defendant but require the website owner to share and disclosure the web users' valuable behavioral web browsing data with the unauthorized third-party marketer.

10. Google, and other ad tech companies, are similarly motivated to collect this valuable data, with Google's online advertising business generated 42.4% of global digital ad revenues in 2023.[1]

---

[1] *Global Digital Advertising Revenues – A Look at the Big Three*, VISIBLE ALPHA (May 17, 2023), https://visiblealpha.com/blog/global-digital-advertising-revenues-a-look-at-the-big-three-alphabet-googl-meta-platforms-meta-amazon-com-amzn/ (last visited June 18, 2026).

11. With the intent to monetize the patient information flowing through its Website, Defendant installed Tracking Tools from the Unauthorized Third-Party Marketers onto its Website, which provided Defendant with valuable marketing tools to create more efficient and profitable marketing campaigns.

12. In implementing the Tracking Tools, however, Defendant deprived Plaintiffs and Class Members of their privacy and property rights by: (1) surreptitiously tracking, recording, and aggregating Plaintiffs' and Class Members' confidential communications and Private Information; (2) causing Plaintiffs' and Class Member's communications to be disclosed and intercepted by Unauthorized Third-Party Marketers; (3) utilizing the Private Information for marketing purposes, and (4) converting and monetizing the Private Information through various marketing tactics, which upon and belief, included, audience building, retargeting, geo-location, and other invasive marketing tactics. At no point along the data monetization process did Defendant obtain proper expressed written consent from Plaintiffs or Class Members for any of these tortious acts.

13. Indeed, by deploying a combination of Facebook and Google tracking tools, Defendant maximized the exposure of its patients' and prospective patients' Private Information to the valuable advertising ecosystems in order to gain the highest probability of converting new patients with the lowest cost per conversion of a new patient.

14. Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule, protected health information ("PHI") is defined as individually identifiable health information ("IIHI") that relates to a person's past present, or future or mental health, the delivery

of health care services, or payment of health care. Data is identifiable under HIPAA if it directly identifies the individual or there is a reasonable basis it could be used to identify the individual.[2]

15. A covered entity, like Defendant, cannot disclose a person's PHI to a third party or utilize a person's PHI for marketing purposes without express written authorization.

16. Plaintiffs' and Class Members' browsing and behavioral Website data qualifies as PHI because the data (1) related to the past, present and future medical care of the patient and (2) the was data sent in combination with direct and indirect identifiers from which the Plaintiffs and Class Members could be reasonably associated with the data.

17. At a minimum, the information Path divulged to the Unauthorized Third-Party Marketers allowed them to learn that specific individuals were patients seeking or receiving treatment, at Path clinics and other related medical centers. In and of itself, this type of data reveals the fact that an individual is being treated for orthopedic-related medical conditions.

18. Specifically, the information the Tracking Technology collected and disclosed to Google contains Plaintiffs and Class Members' confidential communications in the form of the descriptive page URLs from the pages Plaintiffs and Class Members searched and viewed, including the most sensitive parts of the Website, including: (a) Contact a Clinic page, (b) services pages, (c) conditions pages, and (d) the locations pages ("Private Search/Page View Data"). The Tracking Technology also collected and disclosed specific actions taken by the Plaintiffs and Class Members (i.e., events) on those pages including clicks, views, and entering information on forms on the log-in page (Collectively, "Private Seach/Page View Data" and "Private Page Click Data" will be referred to as "Private Browsing Information")

---

[2] 45 C.F.R. § 160.103.

19. In combination with the disclosure of the Private Browsing Information, the Tracking Tools collected and disclosed unique personal identifiers, including: tracking IDs, timestamps, Google IDs, device ID and a variety of data used for browser finger printing. While appearing anonymous, the unique identifiers are unique data points from which Google can either directly identify with their records or easily cross reference with other expansive data sets to connect and identify the Plaintiffs and Class Members with the specific Private Browsing Information.[3]

20. Google, for example, can easily connect patient data from Defendant's Website to the individual patient's Google Account (cid) which is linked to his/her Google account and contains additional details about their identity. Google "stores users' logged-in identifier on non-Google websites…in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads." [4]

21. Simply put, the health information disclosed through the Tracking Tools is personally identifiable health information and is the digital equivalent of disclosing a

[3] Defendant's Facebook Pixel has its own unique identifier (represented as id=4655432104470418), which can be used to identify which of Defendant's webpages contain the Facebook Pixel. Separately, "Google Analytics stores a client ID in a first-party cookie named _ga to distinguish unique users and their sessions on your website. Analytics doesn't store the client ID when analytics storage is disabled through Consent Mode." https://support.google.com/analytics/answer/11593727?hl=en#:~:text=Google%20Analytics%20stores%20a%20client,is%20disabled%20through%20Consent%20Mode. (last visited Feb. 27, 2026).

[4] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (Order denying summary judgment and citing internal evidence from Google employees).

comprehensive patient list to Google. Indeed, the Unauthorized Third-Party Marketers each offer Tracking Tools free of charge, but the price that Defendant paid was the intercepted patient data. Effectively, Defendant traded its patient list for access to the "free" marketing tools.

22. The HIPAA Safe Harbor rule allows for a limited data set[5] of PHI to be disclosed provided (1) specific direct identifiers are removed from the data set and (2) the recipient enters into a Business Associate Agreement ("BAA") promising certain safeguards. But here, the Safe Harbor would not apply: the identifiers were not removed, and upon information and belief, there was no BAA signed (it is well recognized that Google and Meta will not execute BAAs with healthcare providers related to the transmission of data from health services websites).

23. To be sure, there are many analytics companies and marketing campaigns that are HIPAA compliant that would have prevented Defendant's tortious acts; but Defendant opted for known non-HIPAA compliant analytics and marketing tactics to take advantage of the free services and gain access to powerful analytics, audience building, and re-targeting tools.

24. Indeed, the Office for Civil Rights at HHS has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online

---

[5] 45 C.F.R. § 164.514(e). A limited data set is protected health information that excludes the following direct identifiers of the individual or of relatives, employers, or household members of the individual: (i) Names; (ii) Postal address information, other than town or city, State and zip code; (iii) Telephone numbers; (iv) Fax numbers; (v) Electronic mail addresses: (vi) Social security numbers; (vii) Medical record numbers; (viii) Health plan beneficiary numbers; (ix)Account numbers; (x) Certificate/license numbers; (xi) Vehicle identifiers and serial numbers, including license plate numbers; (xii) Device identifiers and serial numbers; (xiii) Web Universal Resource Locators (URLs); (xiv) Internet Protocol (IP) address numbers; (xv) Biometric identifiers, including finger and voice prints; (xvi) Full face photographic images and any comparable images. 45 C.F.R. § 164.514(e)(2).

Tracking Tools.[6] The Bulletin expressly provides (in bold type) that "**[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.**" In other words, HHS has expressly stated that CNY's implementation of Tracking Tools violates HIPAA Rules.

25. The Federal Trade Commission (FTC) has also warned hospitals and other entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."

26. Defendant's actions described below in detail violated HIPAA Rules, yet Defendant has taken no action to modify its conduct following the release of numerous class action settlements around the country and by two large local Cincinnati, Ohio based Hospital systems for the same conduct.[7]

27. Despite these duties, representations, and warnings, and without any form of consent from Plaintiffs or Class Members, Defendant implemented and configured a variety of surreptitious tracking technologies on the Website with the intent to collect and analyze its patients and prospective patients' online behavioral data to enhance and profit from its digital marketing programs.

---

[7] *See Doe v. Bon Secours Mercy Health*, Hamilton C.P. No. A 2002633 (Oct. 17, 2025) (Order granting Final Approval of Settlement); *In Re the Christ Hospital Pixel Litig.*, Hamilton C.P. No. A 2204749 (Oct. 29, 2025) (Order granting Final Approval of Settlement).



E-FILED 07/01/2026 9:44 AM / CONFIRMATION 1846100 / A 2603513 / COMMON PLEAS DIVISION / IFIJ

28. The Tracking Tools are typically used to collect and then analyze web users' behavioral data in order to then identify, target, and market products and services to specific audiences built with the assistance of Meta and Google algorithms and computing.

29. Upon information and belief, Defendant utilized Google Tracking Tools to monetize its patient's and prospective patients' data, including Plaintiffs and Class Members, by collecting the data, analyzing the data, and then targeting its patients and prospective patients with marketing campaigns intended to drive more users to the website and convert more scheduled medical services. The marketing tactics likely included creating tracking parameters, customizing and optimizing its website, building custom audiences, and launching digital campaigns.

30. Before Defendant could disclose the Private Medical Information or use it for marketing purposes, it was required to obtain express written consent from each patient and prospective patient.

31. Defendant, however, acted secretly and did not disclose the presence of these Tracking Tools to Plaintiffs or Class Members. Neither Plaintiffs nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook or Google or allowing Defendant to use their PHI for marketing purposes.

32. Consequently, Defendant breached its common law, contractual, and statutory duties by: (1) implementing and configuring Tracking Technology that secretly recorded and surveilled Plaintiffs' and Class Members' Private Medical Communications with Defendant; (2) disclosing Plaintiffs' and Class Members' Private Medical Information to Google without expressed written consent by each patient; (3) disclosing Plaintiffs' and Class Members' Private Medical Information to Google without Business Associate Agreements; and (4) using Plaintiffs'

and Class Members' PHI for marketing purposes without express written consent from each patient.

33. In sum, through the use of Tracking Tools, Defendant intentionally transmitted Plaintiffs' and Class Members' highly sensitive communications and Private Information to Unauthorized Third-Party Marketers, including communications that contained private and confidential health information; and further, Defendant utilized marketing tools and tactics with the intent of monetizing the Plaintiffs' and Class Members' highly sensitive communications and Private Information. Neither Plaintiffs nor any Class Member signed a written authorization permitting Defendant to disclose or use their Private Information for marketing purposes.

34. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous harms and injuries, including invasion of privacy, breach of fiduciary duty, breach of confidentiality, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

35. Consequently, Plaintiffs individually and on behalf of the putative Class, bring this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiffs and the putative Class have suffered and seek the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), statutory damages, and in the alternative, nominal. Plaintiffs further seek restitution and disgorgement of profits or cost savings obtained from the improper use of the Private Information. Finally, Plaintiffs seek injunctive relief to address the ongoing invasion of

privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

36. Plaintiffs seek to remedy these harms and bring causes of action for (1) Invasion of Privacy (2) Breach of Fiduciary Duty; (3) Breach of Implied Contract; (4) Unjust Enrichment; (5) Interception and Disclosure of Electronic Communications in Violation of Ohio Rev. Code § 2933.52; (6) Breach of Confidence (*Biddle*); and (7) Civil Liability for Criminal Actions under R.C. § 2307.60, et seq.

## PARTIES

37. Plaintiffs B.C. and L.P. are natural persons and citizens of Ohio where they intend to remain.

38. Defendant Phoenix Group Home, LLC d/b/a Path Behavioral Healthcare is a health care provider that is organized in Utah as a limited liability company with a principal place of business located at 3012 Glenmore Avenue, Cincinnati, Ohio 45238.

39. Path is a community-based behavioral health organization that focuses on connecting mental health services with medical care and support. Path conducts the majority of its business in Ohio where it has more than 30 independent locations. Path also operates 3 locations in West Virginia, Louisiana, and Virginia.[8] It provides a wide range of mental health services including treatment for certain behavioral health conditions as well as group therapies and medication management services.[9]

[8] https://pathihc.com/our-locations/ (last visited June 18, 2026).
[9] https://pathihc.com/conditions/ (last visited June 18, 2026).

40. Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

**JURISDICTION & VENUE**

41. This Court has subject matter jurisdiction over this action under R.C. 2305.01 and R.C. 1345.04.

42. This Court has personal jurisdiction over Defendant because the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

43. Venue is proper in Hamilton County under Civ. R. 3(C)(3) because Defendant's principal place of business is in Hamilton County.

**COMMON FACTUAL ALLEGATIONS**

**A. Duty of Confidentiality**

44. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

45. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

46. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

47. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services.



E-FILED 07/01/2026 9:44 AM / CONFIRMATION 1846100 / A 2603513 / COMMON PLEAS DIVISION / IFIJ

> *Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship.* Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

48. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. *Physicians who collect or store patient information electronically…must…:(c) release patient information only in keeping ethics guidelines for confidentiality.*

**B. Expectation of Privacy**

49. At all times when Plaintiffs and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

50. Plaintiffs and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant, and would not have paid for Defendant's healthcare services, or would have paid less for them, had they known that Defendant would disclose their Private Information to third parties.

51. A patient's web activity and Private Medical Information include page views of medical information, page views of specific physicians, form completions requesting a medical appointment, clicks on log in buttons for access to a patient portal, and form completions paying a medical bill, all relate to the past, present, and future medical care of that individual. Moreover,

that web activity when combined with unique identifiers that can connect the web activity with a specific person is protected health information ("PHI") under HIPAA.

52. Defendant deprived Plaintiffs and Class Members of their privacy rights when it intentionally, and/or recklessly, and/or negligently: (1) implemented and configured several Tracking Tools on its Website that surreptitiously tracked, surveilled, and recorded Plaintiffs' and Class Members' PHI, (2) disclosed Plaintiffs' and other Class Members' PHI to unauthorized third parties (i.e. Google and Meta); (3) utilized Plaintiffs' and Class Members' PHI for marketing purposes; and (4) ) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

53. By installing and implementing both Facebook and Google Tracking Technology, Defendant intentionally and proximately caused Plaintiffs' and Class Members' PHI to be intercepted by and/or disclosed to Facebook and Google.

C. **Underlying Web Technology Tracking Tools & Communications**

54. To understand Defendant's unlawful data-sharing and data misuse practices, it is important first to understand the basics of computer science and online communications.

55. Devices (such as computer, tablet, or smart phone) access web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

56. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

57. Every website is comprised of markup and source code. Markup is the visual page —the images and content—that the user can see and interact with. Source Code is essentially the

back of the website, and the user does not see what is happening in the source code with ordinary browsing activity. The source code is the set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. The source code is the mechanism that controls how the user's browser and website server communicate and interact with each other, so the user can utilize the website's functionality. ("Source Code").

58. As a user interacts with a website, multiple forms of web communications are occurring in the background between the user's browser and the website's server and include, but are not limited to:

- **HTTP Requests** are electronic communications sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests (e.g., request to access a page). POST Requests are requests to send data to the server (e.g., Form Submissions);

- **HTTP Responses** are electronic communications sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data;[10]

- **Universal Resource Locators ("URL")** are a web address that contain details of the HTTP Request and the user's specific search and browsing activities;

- **Cookies** are a small text file that are set by the website the user is visiting and establish lines of communication between the user's browser and the website server. First Party Cookies are used to store information on the client device which can later be communicated to a server or servers such as user preferences (e.g., remember log in info). Users cannot detect or prevent transmissions through first-party cookies. Third-Party Cookies are set by a third-party domain such as Google and are used for targeted marketing purposes. Third-Party cookies can tract the user across the web as the user searches and visits other websites.

---

[10] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.



E-FILED 07/01/2026 9:44 AM / CONFIRMATION 1846100 / A 2603513 / COMMON PLEAS DIVISION / IFIJ

59. A website owner, if motivated, can manipulate the HTTP Request process and allow third parties access to the user-server web communication. This interference is typically done through Tracking Technology with the intent to gather data from the user's website behavior for monetization in a variety of marketing purposes.

60. Tracking Technology is implemented on a website by secretly embedding and configuring the tracking software into the Source Code. Once the Tracking Technology is implemented and configured in the Source Code, the Tracking Technology automatically intervenes and manipulates the HTTP web communication between the user's browser and the website server and instructs the Website to send a duplicate transmission of the communication to unauthorized third-party servers, i.e., Google.

61. Here, without its patients' consent, Defendant effectively used its Source Code to commandeer and "bug" or "tap" its patients' computing devices, allowing Google and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications, including PHI.

**D. Defendant Collected & Disclosed Plaintiffs' and Class Members' Private Information to Meta Through the Use of the Meta Pixel.**

62. Defendant implemented and configured at least one Meta Pixel (ID: 2239453113008865) in its Website Source Code with the intent to: (a) intervene and manipulate Plaintiff's and Class Members' HTTP request communications; and (b) to collect and share Plaintiff's and Class Members' behavioral data with Meta.

63. Defendant and Meta collected vast amounts of Private Information about Plaintiffs and the Class Members through the Meta Pixel.



E-FILED 07/01/2026 9:44 AM / CONFIRMATION 1846100 / A 2603513 / COMMON PLEAS DIVISION / IFIJ

64. The Meta Pixel is a small (often invisible) piece of code that can be placed in the source code of a website, emails, or digital ads for data collection purposes. The Meta Pixel is a specific type of tracking pixel that connects a web user's browsing activity directly to the Meta advertising ecosystem (Facebook and Instagram). It offers highly valuable and effective integration between the data collected on a website with advertising campaigns through Meta platforms that include Meta Business Suites and Meta Ads Manager. The primary purpose of the Meta Pixel to force a connection between the user's device and Meta's server, so that the Defendant can monitor, surveil, and collect user activity on its Website for marketing purposes.

65. Meta offers Tracking Tools to entities like Defendant as "free" software that advertisers can easily integrate into their webpages, mobile applications, and servers thereby enabling the almost seamless implementation and configurations of pixels into the Source Code. In fact, however, the access to the Meta tools are bartered in exchange for Defendant's patients' PHI.

66. By installing and implementing the Meta Pixel, Defendant caused Plaintiffs' and Class Members' communications to be intercepted by and/or disclosed to Meta. As described above, once the Meta Pixel code is implemented in the Website source code, the pixel automatically intervenes with the web-user's browser and causes an unauthorized HTTPS Request and Response command to the user's browser forcing the user's browser to send Meta information about the user's visit on the Website and the user's identity.

67. The baseline configuration collected standard events including page views, links clicked, forms completed and submitted; timestamps of when the event occurred; and referrer data (showing which page lead the user to the current one). Additional custom event tracking can be added by configuring additional code.

68. When Plaintiffs and Class Members visited the Website, they would only see the Markup. Behind the scenes, however, the Meta Pixel software was embedded in the Source Code and was automatically transmitting what the patient did on the webpage and effectively opening a hidden spying window for Meta into the patients' behavior and browser.

69. As a direct result of implementation and configuration of the Meta Pixel, Defendant disclosed Private Health Information to Meta in the forms of page views, button click tracking, form download tracking, and conversion tracking that related to the past, present and future medical care of Plaintiffs and Class Members including but not limited to the following categories of sensitive health information:

70. Each of these web communications were disclosed without Plaintiffs or Class Members express written consent and without a business associates agreements with between Defendant and Meta.

71. Each of these tracked and disclosed web communications are PHI because the tracked page views, clicks, downloads, and conversions each (1) related to the past, present and future medical care of Plaintiffs and Class Members, (2) confer and indicate that the user (Plaintiffs and Class Members) was a patient or prospective patient at the time of the tracked web activity, and (3) as discussed below, the behavioral data is identifiable with a specific user through the identifiers that were also disclosed to Meta at the same time.

**E. Plaintiffs' and Class Members' Health Data was Reasonably Identifiable Through Meta Identifiers.**

72. With each web communication between a Plaintiff or a Class Member and the Website's server, persistent user identifiers were disclosed to Meta. These various identifiers

would allow Meta connect the specific patient with the activity as well as enable cross platform tracking and audience creation based on the healthcare seeking behavioral data.

73. Facebook used several digital identifiers: First, when the website user is logged into Facebook on their web browser or device, the website user's identity is revealed via Third-Party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's c_user cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online communications and interactions to their individual Facebook profile.

74. A user's Facebook profile generally contains a wide range of demographic and other information about the user, including location, pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

75. The Meta Pixel also works in combination with persistent identifiers and fb_cookies (FID) or c_user cookies to connect the specific behavioral data on the Website to individuals, where it can be further used to build user profiles and enable cross-device tracking to surveil and collect data from individuals as they search and review other website content. Information sent to Facebook was sent alongside the Plaintiffs' and Class Members' Facebook ID (c_user cookie or "FID"), thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts and therefore their identity.

76. But the c-user cookie is not the only means by which Facebook can identify a specific individual from the web communication.

77. When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies.

78. Regardless of whether a user is logged into a Facebook account, the fr cookie contains an encrypted Facebook ID and browser identifier. Facebook, at a minimum, uses the fr cookie to identify users, and this particular cookie can stay on a user's website browser for up to 90 days after the user has logged out of Facebook.

79. The cookies listed in the image above are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. Although Facebook created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Facebook would not have received this data but for Defendant's implementation and use of the Pixel throughout its website.

80. Defendant, however, also revealed its website visitors' identities via more powerful first-party cookies such as the _fbp cookie that Facebook uses to identify a particular browser and a user. This identifier is highlighted in the below timestamps.

**fbp= fb.1.1780677482084.958347319288115135**

81. Importantly, the _fbp cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies because, unlike the fr cookies and c_user cookie, the _fbp cookie functions as a first-party cookie—i.e. a cookie that was created and placed on the website by Defendant.

82. In summation, Facebook, at a minimum, uses both first party and third-party cookies to link website visitors' communications and online activity with their corresponding Facebook profiles, and, because the Pixel is automatically programmed to transmit data via both

first-party and third-party cookies, patients' information and identities are revealed to Facebook even when they have disabled third-party cookies within their web browsers.

### F. Defendant Collected & Disclosed Plaintiffs' and Class Member's Private Information to Google Through the Use of Google Tracking Tools.

83. Google offers Tracking Tools to entities like Defendant for "free." However, access to the Google tools are also bartered in exchange for Defendant's patients' PHI. By implementing and configuring Google Analytics, Defendant caused Plaintiffs' and Class Member's communications to be intercepted by and/or disclosed to Google.

84. Defendant's Source Code implemented with Universal Analytics (UA-103801741-1) and GA-4 (G- D2Y0BXSKW9) manipulated the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Google.

85. Google Analytics (Universal and GA-4) is marginally different than the Meta Pixel but essentially accomplishes the same goal; tracking what a user communicates to Defendant's website.[11] Google Analytics records the exact page and title; and Google Ads would fire three conversion trackers marking the user as a potential patient. These transmissions also occurred contemporaneously, invisibly, and without the patient's knowledge.

86. As the user navigates the site, Google Analytics sends a special "file download" event to its servers containing: (1) exact file name "facesheet.pdf"; (2) the full URL to the medical form; (3) time on the page before downloading; and (4) assigns a permanent tracking ID linking the user to all previous visits.

[11] Amrita Singh, *Comparing Google Analytics vs Facebook Pixel*, Boltic (Nov. 17, 2022), https://www.boltic.io/blog/google-analytics-vs-facebook-pixel (last visited June 18, 2026).

87. As a direct result, Defendant disclosed confidential communications and PHI to Google in the forms of page views and events relating to the past, present and future medical care of Plaintiffs' and Class Members. Without discovery, Plaintiffs are unable to know the precise configuration in the Google Tag Manager Container or to determine precisely what form content and fields may also have been disclosed.

88. Each of these tracked and disclosed web communications are PHI because the tracked page views, clicks, and events each (1) related to the past, present and future medical care of Plaintiffs and Class Members, (2) confer and indicate that the user (Plaintiffs and Class Members) was a patient or prospective patient at the time of the tracked web activity, and (3) as discussed below, the behavioral data is identifiable with a specific user through the identifiers that were also disclosed to Meta at the same time.

89. Each of these web communications were disclosed without Plaintiffs' or Class Members' express written consent and without a business associates agreements between Defendant and Meta. Defendant and Google collected vast quantities of Plaintiffs' and Class Members' Private Information through Universal Analytics.

**G. Google Identifiers**

90. Defendant and Google tracked each Plaintiff and Class Member, whether Google with persistent IDs through Universal Analytics and Google Ad Words who visited the Website.

91. Google, like Meta, uniformly stored a unique identifier in its logs for each Plaintiffs and Class Member, whether in private browsing mode or non-private browsing mode. The unique identifier can then be used to connect the individual with the collected browsing

activities on that Website. The value in the identifiers is that Google and Defendant can then use the identifiable behavioral data for serving personalized ads.[12]

92. Similarly, Google "stores users' logged-in identifier on non-Google websites…in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from to collect and utilize the user's browsing activities on that website.

93. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads.[13] Google users who are logged-in to their Google accounts also have an identifier that is stored in Google's logs. Google logs a user's browsing activities on non-Google websites and uses these data for serving personalized ads.[14]

94. Google also tracks all users, whether Google or not, with persistent IDs through Universal Analytics and Google Ad Words.

---

[12] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (Order denying summary judgment and citing internal evidence from Google employees). Google also connects user data to IP addresses, IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates", HHS, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 18, 2026) ("Such PHI may include, for example, an individual's IP address . . .").

[13] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (Order denying summary judgment and citing internal evidence from Google employees). Google also connects user data to IP addresses, IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates", HHS, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 18, 2023) ("Such PHI may include, for example, an individual's IP address . . .").

[14] *Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, FN11 (quoting Google employee deposition testimony explaining how Google tracks user data).



E-FILED 07/01/2026 9:44 AM / CONFIRMATION 1846100 / A 2603513 / COMMON PLEAS DIVISION / IFIJ

95. If a Plaintiff or Class Member was logged in to his or her Google account while navigating the Website, Google's logs would include an additional identifier to further match an individual's browsing activities for additional tracking to serve personalized ads.[15]

96. As a direct result, Defendant disclosed confidential communications and PHI to Google in the forms of page views and events relating to the past, present and future medical care of Plaintiffs' and Class Members.

97. At a minimum, Defendant disclosed sufficient Private Information from which Google could infer Plaintiffs' and Class Members' patient status.

98. Due to the vast network of information held by Google and its highly sophisticated algorithm, Google can easily and reliably match the IP addresses, device information, and the unique identifiers to connect an individual with the tracked browsing activity.

99. Google then utilizes such information to design and offer tailored marketing products such as Google Ad Words, which can be used for targeted advertising on those individuals.

100. Defendant gained access to and utilized these powerful and valuable retargeting products in exchange for Plaintiffs and Class Members Private Information

101. A user's Google ID ("GID"), a unique identifier similar to the c_user ID Facebook uses and described above, is also included and sent to Google identifying the user within Google's own system.

---

[15] *Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, FN11 (quoting Google employee deposition testimony explaining how Google tracks user data).

**E. Other Digital Identifiers (IP Address and Browser Fingerprinting)**

102. The baseline configurations on Meta and Google also collected and disclosed extensive amounts of additional user data that can be used to identify the specific user, including, but not limited to: user's IP address; type of device, operating system and browser details (browser finger printing).

103. On information and belief, through the use of the Tracking Tools on Defendant's Website, Defendant also disclosed and otherwise assisted third parties with intercepting Plaintiffs' and Class Members' Computer IP addresses.

104. An IP address is a number that identifies the address of a device connected to the Internet.

105. IP addresses are used to identify and route communications on the Internet.

106. IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

107. Facebook tracks every IP address ever associated with a Facebook user.

108. Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

109. As to Google, whenever a user visits a website that is running Google Analytics and Google Ad Manager, Google's software scripts on the website surreptitiously direct the user's browser to send a secret, separate message to Google's servers in California, which includes the user's IP address, the user's geolocation, information contained in Google cookies, any user-ID issued by the website to the user, and information about the browser the user is using.

110. Upon information and belief, Defendant did not enable the anonymize feature provided by Google Analytics because the text "aip:" does not appear in the image.



E-FILED 07/01/2026 9:44 AM / CONFIRMATION 1846100 / A 2603513 / COMMON PLEAS DIVISION / IFIJ

111. Accordingly, Google was also likely receiving patients' communications and PHI alongside the patients' IP address.

112. In addition to these personally identifiable persistent identifiers, upon receiving information from Defendant's Websites, Google and Meta also utilize a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

113. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[16]

114. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

115. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[17]

116. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it

---

[16] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017) https://www.ndsssymposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

[17] Justin Schuh, *Building a more private web*, GOOGLE (Aug. 22, 2019), https://blog.google/products/chrome/building-a-more-private-web/.



E-FILED 07/01/2026 9:44 AM / CONFIRMATION 1846100 / A 2603513 / COMMON PLEAS DIVISION / IFIJ

employs much more subtle techniques.[18] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

117. Browser-fingerprints are personal identifiers. Google Analytics and other Google tracking tools can collect browser-fingerprints from website visitors.

118. Without discovery and full disclosure of the complete source code, Plaintiffs cannot identify all browser fingerprint data at issue. However, review of the available code shows full browser/OS fingerprints, and screen/viewport sizes. Upon information and belief, additional data points were likely transmitted allowing for more accurate and identifiable browser fingerprinting.

**F. Web User's Journey on the Website**

119. In order to add additional detail to the allegations, the following paragraphs will walk through the website detailing the process of what Plaintiffs and Class Members would experience when utilizing the Website, as well as showing what was happening secretly in the Source Code surveilling their activity.

**1. Path Homepage**

120. As patients enter the homepage of the cite, they were entering a secretive digital world that was surveilling each movement and each decision they made on the site, as reflected in the image below.

[18] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY (Apr. 11, 2024), https://www.pixelprivacy.com/resources/browser-fingerprinting.




*Figure 1. is screenshot from 2026 of source code showing an active Facebook Pixel and Google Tracking Tools on Defendant's Homepage.*

### 2. Contact a Clinic Page and Selecting a Location

121. As a patient navigates the website, they can seek to "Contact a Clinic" and choose from a list, as depicted below. The page itself contains both the Facebook Pixel and Google Tracking Tools which are capturing the data patients enter into the form.




*Figure 2. is screenshot from 2026 of source code showing an active Facebook Pixel and Google Tracking Tools on Defendant's Contact a Clinic page.*

122. As this scenario plays out with thousands of users searching for and communicating about their medical care on Defendants website, the data collected from the Metal Pixel is then linked to Meta Business Suites and Meta Ads Manager for organization and monetization. Through these Meta tools, Defendant had access to sophisticated data analytics reports that can be utilized for website optimization, profile building, and advertising campaign optimization.

123. Upon clicking a specific location, the patient's browser automatically sent an HTTP Request to Defendant's web server. Defendant's web server then automatically returned an HTP Response, which loads the Markup for that particular webpage. The user only sees the markup, not Defendant's Source Code or underlying HTTP Requests and Responses operating behind the curtain of the Website. Google is now informed that the patient is considering the Cincinnati location for treatment.



E-FILED 07/01/2026 9:44 AM / CONFIRMATION 1846100 / A 2603513 / COMMON PLEAS DIVISION / IFIJ




*Figure 3. Screenshot from 2026 of Path's Cincinnati location page and accompanying URL displaying the page.*

124. As the source code for the Cincinnati location page demonstrates, Defendant has several Google Tracking Tools enabled which let Defendant and Google know that the patient is interested in treating at this particular location.

| | |
|---|---|
| Accept | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding | gzip, deflate, br, zstd |
| Accept-Language | en-US,en;q=0.9 |
| Cache-Control | no-cache |
| Cookie | NID=532=q9NJ6KialfNirUvgv1Xp32_zB6R5IE4v446twwW5WqjZdthw7SgDCXfcmOM5vSgN5McWdGnrNga_7EvJ8WrzsBTpD7vWyJheLHuGkuNB3squ3mSe_Zj991y5vXQhHvOC0SQ07H2n5XObBwnOlyN0IV9qKM10SkgsgKbC5DTnbN_clH_ZfyPMAzE4L3f56qwkriMkBGG-oqv_566I3jqGuSE4QCJzHAEI6LbHMd_3t2ECCHASqZ28uOH-AKU-adUMQ89TtDfIhKc |
| Pragma | no-cache |
| Priority | i |
| Referer | https://www.google.com/maps/embed/v1/place?key=AIzaSyCcywKcxXeMZiMwLDcLgyEnNglcLOyB_qw&q=%203012%20Glenmore%20Ave.%20Suite%20104,%20Cincinnati,%20OH,%2045238&zoom=15 |
| Sec-Ch-Ua | "Chromium";v="148", "Google Chrome";v="148", "Not/A)Brand";v="99" |
| Sec-Ch-Ua-Mobile | ?0 |
| Sec-Ch-Ua-Platform | "macOS" |
| Sec-Fetch-Dest | image |
| Sec-Fetch-Mode | no-cors |
| Sec-Fetch-Site | same-origin |
| Sec-Fetch-Storage-Access | active |
| User-Agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/148.0.0.0 Safari/537.36 |
| X-Browser-Channel | stable |
| X-Browser-Copyright | Copyright 2026 Google LLC. All Rights Reserved. |
| X-Browser-Validation | DFscXLDsHH1VQnRCDDL79rC1sbU= |
| X-Browser-Year | 2026 |
| X-Client-Data | CKmdygEIlaHLAQiGoM0BCM7MIDAI7cyUMBjby5Qw<br>Decoded:<br>message ClientVariations {<br>// Active Google-visible variation IDs on this client. These are reported for analysis, but do not directly affect any server-side behavior.<br>repeated int32 variation_id = [3313321, 3330197, 3362822, 101000782, 101000813];<br>// Active Google-visible variation IDs on this client that trigger server-side behavior. These are reported for analysis *and* directly affect server-side behavior.<br>repeated int32 trigger_variation_id = [101000667];<br>} |

*Figure 4. Screenshot from 2026 of source code from Path's Cincinnati location page displaying Google Tracking Tools.*

125. Indeed, Figure 5 displays that Path is transmitting this information to Google, as it states "Active Google-visible variation" in the source code.

126. Thus, without alerting the user, Defendant's tracking tools collected and sent the web communications the user made via the webpage to Meta and Google, and the images below confirm that the communications contain the user's Private Information.

### 3. Researching Treatments and Conditions

127. Upon visiting the Web Properties, Path provides the user with certain information about treatments and conditions for which it provides care. If a user navigates to page about a condition, whatever they are viewing is communicated to Facebook and Google. In the below example, the user visited the page for "Anxiety Disorders" which caused the tracking pixels to fire.

128. Much like when the user selects a location as depicted above, when a user navigates to the treatment/condition page, the user's browser automatically sent an HTTP Request to Defendant's web server. Defendant's web server then automatically returned an HTP Response, which loads the Markup for that particular webpage. Similarly, the user only sees the markup, not Defendant's Source Code or underlying HTTP Requests and Responses operating behind the curtain of the Website. Facebook and Google are now informed that the patient is seeking treatment for anxiety disorders, or suffers from anxiety disorders.



E-FILED 07/01/2026 9:44 AM / CONFIRMATION 1846100 / A 2603513 / COMMON PLEAS DIVISION / IFIJ




*Figure 5. Screenshot from 2026 showing Facebook and Google Pixels firing on condition/treatment page for Anxiety Disorders.*

129. This unauthorized transmission of the user's interactions with the Web Properties is highly offensive to the reasonable person, as their browsing history is directly linked to their confidential PHI, and that browsing history is undoubtedly being shared with Facebook and Google.

**G. The Disclosure of Private Health Information to Google and Meta Violated HIPAA Regulations.**

130. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

131. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an



E-FILED 07/01/2026 9:44 AM / CONFIRMATION 1846100 / A 2603513 / COMMON PLEAS DIVISION / IFIJ

individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

132. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[19]

133. The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

134. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

[19] HHS.gov, HIPAA For Professionals https://www.hhs.gov/hipaa/for-professionals/index.html (last visited July 1, 2026).



E-FILED 07/01/2026 9:44 AM / CONFIRMATION 1846100 / A 2603513 / COMMON PLEAS DIVISION / IFIJ

135. Under the HIPAA de-identification rule, in order to adequately de-identify a data set relating to health care services, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

> a. Names;
>
> ***
>
> H. Medical record numbers;
>
> ***
>
> J. Account numbers;
>
> ***
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O. Internet Protocol (IP) address numbers; … and
>
> R. Any other unique identifying number, characteristic, or code…;and"
>
> The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514.

136. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this

> information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[20]

137. In its guidance for Marketing, the HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, *the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing*. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[21]

138. Here, Defendant effectively traded its patient list for access to these valuable marketing tools. And neither Plaintiffs nor any Class Member provided express written consent for the use of their PHI for marketing purposes.

139. While there was not a direct sale of the patient list, by disclosing the patient status of all the users of the Website in exchange for valuable marketing tools, Defendant engaged in a bartered commercial transaction whereby its patient list was constructively and effectively sold to the world's largest marketing companies.

---

[20]Guidance Regarding Methods for De-identification of Protected Health Information in Accordance With the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, HHS (Nov. 26, 2012), available at https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[21] *OCR HIPAA Privacy: Marketing*, HHS (Apr. 3, 2003), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

140. The Tracking Tools allow advertisers to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs.

141. Defendant utilized the Tracking Tools on numerous sensitive pages of its Website with the intent to share and disclose Plaintiffs' and Class Members' confidential web communications and behavioral data with Meta.

142. Whether intentional, reckless, or negligent, the data shared with Meta and Google was PHI.

143. Upon information and belief, Defendant utilized the Tracking Tools and shared PHI with Meta and Google with the intent to maximize its marking return on investment.

144. Upon information and belief, Defendant accessed and utilized Meta Business Suites and Ads Manager Reports to review and utilize the Meta Pixel data to refine and design its advertising strategies. These strategies were intended to monetize Plaintiffs' and Class Members data and included one or more of the following: website analytics, advertising optimization, conversion tracking, and/or email marketing.

**H. Meta Ads and Business Suites**

145. The Meta Pixel does not work in isolation but connects a web user's browsing activity directly to the powerful Meta advertising ecosystem (Facebook and Instagram). It offers highly valuable and effective integration between the data collected on a website with advertising campaigns through Meta platforms that include Meta Business Suites and Meta Ads Manager.

146. After intercepting and collecting the Private Information, Meta processes the data, analyzes it, segments and assimilates it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Meta will associate the collected information with a Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity. A user's

Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

147. In addition to the Website analytics, Meta Pixel creates value for the Defendant by providing Defendant with access to sophisticated algorithms and computer learning (AI) tools that allows Defendant to further utilize Plaintiffs' and Class Members' behavioral data on the website to build highly targeted audiences. These audiences include both custom audiences and look-a-like audiences.

148. A "custom audience" is used to re-target users who have previously visited a website or taken specific actions on the website. For example, if a user visited Defendant's Website and didn't request an appointment, a custom audience could be built from the data gathered from the Meta Pixel to retarget those users with specific ads to try to get them to come back to the Website to schedule an appointment.

149. A "look-a-like audience" is designed to with the goal of reaching new potential customers who share similar characteristics, behaviors, and demographics as the existing high value customers tracked by the Meta Pixel. In this scenario, if Defendant wanted to target potential patients for hip replacement surgery, it could analyze, segment and use the data collected from patients who completed book an appointment forms for hip replacement surgery to build a look-a-like audience. That audience would then be used in combination with Meta's vast ecosystem and

advertising platform to get ads in front of individuals with the same or similar profiles as the current hip replacement patients of Defendant.

150. The Meta Pixel further provides real time data to Meta's algorithms, allowing for automatic optimization of ad delivery. Meta's systems use the data provided from the Meta Pixel to learn and predict which users are more likely to convert and complete a request for appointment and will automatically target those potential patients to maximize the ad spend. In other words, the powerful Meta algorithm that has been gathering data from all aspects of the internet incorporates the patient data from the Website to place digital advertisements in front of audiences with the greatest chance of becoming a new patient of Defendant. The per patient conversion cost is then expected to be far lower than if Defendant attempted to use less sophisticated and targeted forms of advertising like traditional media, where the add impression cost is much higher and the cost to convert a patient is higher.

151. Upon information and belief, Defendant was also aware of the Meta tools designed to transmit data directly to Facebook through the use of first-party cookies called Facebook's Conversions Application Programming Interface ("CAPI"), which is a server-to-server transmission.

152. CAPI is another Facebook tool that functions as an alternative measure to circumvent any ad blockers or other denials of consent by the website user by transmitting information directly from Defendant's servers to Facebook's servers.[22, 23] Facebook markets CAPI

---

[22] Reggie Paquette, *What is the Facebook Conversions API and how to use it*, Birch (Mach 5, 2021), https://bir.ch/blog/facebook-conversions-api.

[23] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar

as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[24]

153. Defendant is in exclusive control over whether CAPI was implemented. But the availability of the Tool shows notice of the privacy concerns when utilizing the Meta Pixel. Moreover, while Defendant is in exclusive control of any audience marketing campaigns it built and utilized, the presence of targeted Facebook advertisements online indicates that Defendant was utilizing Meta Business tools to create audiences and monetize Plaintiffs' and Class Members browsing activity and Private Information collected from the Website.

154. At a minimum, Defendant disclosed sufficient Private Information from which Meta could infer Plaintiffs' and Class Members' patient status

**I. Defendant's Marketing Practices Violated HIPAA Standards**

155. While Plaintiffs do not assert a private right of action under HIPAA, the intentional violations of the statutory duties and standards under HIPAA constitute criminal and civil acts subject to penalties imposed by 42 U.S.C. § 1320d-6. Here, Defendant knowingly implemented Tracking Tools with the intent of collecting and disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b).

---

way as other connection channels.", https://developers.facebook.com/docs/marketing-api/conversions-api (last visited June 18, 2026).

[24] *About Conversions API*, Meta Business Help Center, https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited June 18, 2026).

156. The primary motivation and a determining factor in Defendant's collection, interception, and disclosure of Plaintiffs' and Class Members' Private Information was the use of patient data for advertising in the absence of express written consent. Such conduct gives rise to a violation of HIPAA.

157. Moreover, there is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

**J. Defendant's Marketing Conduct Also Violated Ohio Law**

158. Although Defendant is a Utah company, it operates and provided medical services in the state of Ohio and is subject to Ohio laws for the Ohio patients it treats. Ohio courts have long recognized that health care providers like Defendant owe a duty of confidentiality to patients, which prohibits them from disclosing patients' health information without patients' written consent. *Biddle v. Warren General Hospital*, 86 Ohio St.3d 395, 401 (1999).

159. Ohio has made its laws governing the use and disclosure of protected health information consistent with HIPAA. *See* R.C. 3798.01, *et seq.* Ohio law adopts the same definitions of "covered entity," "disclosure," "health care provider," "health information," "protected health information," "individually identifiable health information," and "use" as provided by the HIPAA Privacy Rule. *See* R.C. 3798.01.

160. Defendant is a "covered entity" within the meaning of R.C. 3798.01.

161. Under R.C. 3798.03(A)(2), a covered entity shall "Implement and maintain appropriate administrative, technical, and physical safeguards to protect the privacy of protected

health information in a manner consistent with 45 C.F.R. 164.530(c)."

162. Under R.C. 3798.04, a covered entity shall not do either of the following:

> (A) Use or disclose protected health information without an authorization that is valid under 45 C.F.R. 164.508 and, if applicable, 42 C.F.R. part 2, except when the use or disclosure is required or permitted without such authorization by Subchapter C of Subtitle A of Title 45 of the Code of Federal Regulations and, if applicable, 42 C.F.R. part 2;
>
> (B) Use or disclose protected health information in a manner that is not consistent with 45 C.F.R. 164.502.

163. Under this statute, and the federal standard it incorporates, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization, nor sell such information without disclosing that the disclosure will involve remuneration to the provider.[25]

**K. Defendant Was Enriched and Benefitted from the Use of The Tracking Tools and Unauthorized Disclosures to Google and Meta.**

164. Defendant's further use of Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy.

165. In exchange for disclosing Private Information of its patients, Defendant was enriched and from enhanced advertising services and more cost-efficient marketing on its platform.

166. Upon information and belief, Defendant utilized Plaintiffs' and Class Members' data that was collected through Meta and Google marketing tools to implement one or more of the following marketing tactics: website optimization, audience building, and targeted campaigns, all

[25] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

designed to target current and potential patients to drive more profit. Defendant directly benefited through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

167. By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiffs and Class Members and violating their rights under federal and Ohio law.

### L. Plaintiffs' and Class Members' Private Information Has Financial Value

168. Plaintiffs' data and Private Information has economic value in established marketplaces. Facebook regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences and then sells that information to advertising clients. Google has recognized the value of user data and has even instituted a pilot program in which it pays users $3 per week to track them online.

169. Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

170. The value of health data, including patient lists in particular, is well-known and has been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it

described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[26]

171. Moreover, healthcare systems commonly value the lifetime value of a patient and the value of a marketing lead and impression, as well as the value of the conversion of a new patient.

172. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[27]

173. Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[28]

174. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect

---

[26] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME.COM (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/ (last visited June 18, 2026).

[27] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited c).

[28] VERO, HOW TO COLLECT EMAILS ADDRESSES ON TWITTER https://www.getvero.com/resources/twitter-lead-generation-cards/. (last visited June 18, 2026).

personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

175. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

176. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

177. Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[29]

178. Data brokers obtain large volumes of consumer information without consumer knowledge to resell the data for marketing campaigns. The FTC has investigated the practices and found that "data brokers collect and store billions of data elements covering nearly every U.S. consumer."[30]

179. Data brokers combine online and offline data to markets to consumers online. Data brokers combine and analyze data about consumers to make inferences about them, including

[29] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

[30] *FTC Recommends Congress Require the Data Broker Industry to be More Transparent and Give Consumers Greater Control Over Their Personal Information*, FTC (May 27, 2014), https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-recommends-congress-require-data-broker-industry-be-more-transparent-give-consumers-greater.

sensitive inferences related to health conditions. Some data brokers have been found to store data indefinitely posing significant privacy risks.[31]

180. Data brokers do not obtain the data directly from consumers, rather they obtain it through various sources including partnerships with third party marketers that utilize tracking tools. While each data broker source may provide only a few data elements about a consumers activities a data broker can combine the data sets to form a more detailed profile of the consumer's life.

181. In fact, the unauthorized data collection from third party trackers, tags, and pixels has resulted in a proliferation and expansion of the data broker ecosystem. The web trackers serve as pivotal components in the data broker eco system by facilitating the collection of online activities, preferences, and demographics. This aggregated data is then analyzed and sold to various entities interested in understanding consumer behavior and targeting specific demographics.[32]

182. The U.S. data broker market is projected to from $280.82 billion in 2023 to $382.16 billion in 2030. This expansion is largely driven through the data harvested from the pixels and trackers on the website.

183. As far as medical advertising, the data brokers routinely utilize the data sets to predict which consumers are most likely to use, e.g., brand name medicine, order prescriptions by mail, research medications online, or response to pharmaceutical ads or other treatment advertisements. These predictive models are then sold and used for targeted advertising.

---

[31] *Id.*

[32] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://lokker.com/wp-content/uploads/2024/04/LOKKER_Online-Data-Privacy-Report_032024-2.pdf

184. The lack of transparency in the data brokering ecosystem makes it unknown whether Meta and/or Google sold or traded any of the data they received through the Tracking Technology at issue.

185. However, it is indisputable that theta data at issue given its medical data is highly valuable for segmentation and profile building.

186. Once the data is shared and disclosed to any of the Unauthorized Third-Party Marketers, the Patients, Class Members, and Defendant lose control over its usage and distribution.

**M. Plaintiffs' and Class Members' Common Experience**

187. Plaintiffs and Class Members are Defendant's patients who reside in Ohio and received healthcare services from Defendant. As part of the medical services, Plaintiffs and Class Members used Defendant's Website to communicate Private Information to Defendant on numerous occasions. At all times, while using the Website, Plaintiffs and Class Members had an expectation of privacy that the Private Information provided to Defendant would remain private and confidential.

188. Plaintiffs and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

189. Plaintiffs and Class Members were not aware that their Private Information would be disclosed to the Unauthorized Third Parties and that Defendant was utilizing their Private Information for marketing purposes because Defendant did not acquire their consent.

190. Plaintiffs and Class Members were Facebook and/or Google users.

191. As Plaintiffs and Class members used Defendant's Website, the Website's Source Code configured with Tracking Tools sent a secret set of instructions back to the Plaintiffs' and Class Members' browsers, causing the Tracking Tools to uniformly send Plaintiffs and Class Members Private Information to the Unauthorized Third Parties.

192. Accordingly, during the same transmissions, the Website routinely provided the Unauthorized Third-Party Marketers with digital identifiers allowing the Third Parties to connect the Plaintiffs and Class Members with their Private Information.

193. Furthermore, following the disclosure, Plaintiffs and Class Members Private Information was aggregated and analyzed through the Unauthorized Third-Party Marketers analytics tools and reports. From there, the aggregated data could be segmented and linked to specific user profiles for use in building "custom" and "look- a-like audiences" and was incorporated into the Unauthorized Third-Party Marketers algorithms for other avenues of re-targeting.

194. Once released to the digital marketing ecosystem, the collected data may also be shared or combined with data broker aggregated data and profiles for additional marketing reach.

195. Upon information and belief, Defendant monetized Plaintiffs and Class Members Private Information by building custom and look-a-like audiences to target and re-target patients and potential patients and donors. By utilizing the Unauthorized Third-Party Marketer's tools, Defendant was able to save substantial marketing costs while increasing its cost per conversion, as well as likely increasing its overall new patient conversion.

196. Without discovery, Plaintiffs and Class Members are unable to know the full extent of the improper disclose and use of his Private Information.

**N. Plaintiffs B.C.'s Representative Experience**

197. Plaintiff B.C. is a current patient of Defendant and has paid for and received treatment from Defendant most recently seven months ago.

198. Throughout his patient relationship with Defendant, Plaintiff accessed and utilized Defendant's Website via her smartphones, laptop, and/or desktop as part of her medical care provided by Defendant.

199. More specifically, Plaintiff used the Website to complete the following tasks: (1) research particular specialists, (2) scheduled an appointment and telehealth appointments, (3) filled out patient forms, (4) reviewed pages related to her particular symptoms (5) and regularly used to log in to the patient portal, through which she communicated with her medical providers, reviewed messages related to his medical care and conditions, and reviewed test results.

200. In doing so, she communicated her PHI, including her specific medical symptoms and conditions, the fact that she was booking an appointment, and the fact that she was seeking and received medical treatment for certain mental health conditions.

201. As a result of using the Website in the manner described above, and pursuant to the systematic process described herein, unauthorized third parties obtained Plaintiffs' Private Information. The specific information Facebook and Google received at a minimum that he was in fact a medical patient seeking and received medical treatment from Defendant. Based on the type of treatment sought, and the URLS transmitted, both Facebook and Google likely could infer specific medical diagnosis as well.

202. Plaintiff also has a Google account and Gmail account that she accesses through her smartphone and laptop, both of which she used to access Defendant's Website.

203. Pursuant to the systematic process described herein, Plaintiff's Private Information was disclosed to Facebook and Google, and this data included her PII, PHI, and related confidential information. Specifically, Plaintiff communicated her name, date of birth, address, phone number, email address, insurance information, medical history, and medical symptoms through Defendant's website. Defendant intercepted and/or assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

204. As Defendant's patient, Plaintiff reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted or intercepted by a third party. Plaintiffs also relied on Defendant's Privacy Policies in reasonably expecting Defendant would safeguard her Private Information. But for her status as Defendant's patient and Defendant's Privacy Policies, Plaintiff would not have disclosed her Private Information to Defendant.

205. During her time as a patient, Plaintiff never consented to the use of her Private Information by third parties or to Defendant enabling third parties, including Facebook and Google, to receive, access or interpret such information for marketing or any other purpose.

206. Notwithstanding, through the Tracking Pixel and Conversions API, Defendant transmitted Plaintiff's Private Information to third parties, such as Facebook and Google.

207. After using Defendant's Website, Plaintiff saw targeted advertisements on her Facebook and Google accounts related to her website usage.

208. The disclosure of Plaintiff's sensitive healthcare information, particularly information that she otherwise kept private has caused Plaintiff significant injury. This wanton

disclosure of such personal information would be highly offensive to the typical person, as it is to Plaintiff.

**O. Plaintiffs L.P.'s Representative Experience**

209. Plaintiff L.P. is a current patient of Defendant and has paid for and received treatment from Defendant most recently one month ago.

210. Throughout her patient relationship with Defendant, Plaintiffs accessed and utilized Defendant's Website via her smartphones as part of her medical care provided by Defendant.

211. More specifically, Plaintiff used the Website to complete the following tasks: (1) research particular specialists including psychiatrists, (2) scheduled an appointment, (3) requested information about her treatment and conditions, (4) and regularly used to log in to the patient portal, through which she communicated with her medical providers, reviewed messages related to her medical care and conditions, and reviewed test results.

212. In doing so, she communicated her PHI, including her specific medical symptoms and conditions, the fact that she was booking an appointment, and the fact that she was seeking and received medical treatment for certain mental health conditions.

213. As a result of using the Website in the manner described above, and pursuant to the systematic process described herein, unauthorized third parties obtained Plaintiff's Private Information. The specific information Facebook and Google received at a minimum that she was in fact a medical patient seeking and received medical treatment from Defendant. Based on the type of treatment sought, and the URLS transmitted, both Facebook and Google likely could infer specific medical diagnosis as well.

214. Plaintiff has a Facebook, Instagram, and Google account that she accesses through her smartphone, which she used to access Defendant's Website.

215. Pursuant to the systematic process described herein, Plaintiff's Private Information was disclosed to Facebook and Google, and this data included her PII, PHI, and related confidential information. Specifically, Plaintiff communicated her name, date of birth, address, phone number, email address, insurance information, medical history, and medical symptoms through Defendant's website. Defendant intercepted and/or assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiffs' Private Information.

216. As Defendant's patient, Plaintiff reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted or intercepted by a third party. Plaintiffs also relied on Defendant's Privacy Policies in reasonably expecting Defendant would safeguard her Private Information. But for her status as Defendant's patient and Defendant's Privacy Policies, Plaintiff would not have disclosed his Private Information to Defendant.

217. During his time as a patient, Plaintiff never consented to the use of her Private Information by third parties or to Defendant enabling third parties, including Facebook and Google, to receive, access or interpret such information for marketing or any other purpose.

218. Notwithstanding, through the Tracking Pixel and Conversions API, Defendant transmitted Plaintiff's Private Information to third parties, such as Facebook and Google.

219. After using Defendant's Website, Plaintiff saw repeated targeted advertisements on her Facebook account regarding Defendant and/or her medical conditions.

220. The disclosure of Plaintiff's sensitive health information, particularly information that she otherwise kept private has caused Plaintiff significant injury. This wanton disclosure of such personal information would be highly offensive to the typical person, as it is to Plaintiff.

**P. Class Wide Injuries, Damages, and Remedies**

221. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous harms and injuries, including invasion of privacy, breach of fiduciary duty, breach of confidentiality, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

222. Consequently, Plaintiffs individually and on behalf of the putative Class, bring this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiffs and the putative Class have suffered significant damages and seek the following remedies:

a. Compensatory damages;

b. Loss of benefit of the bargain;

c. Conversion (FMV value of the use of the data for marketing);

d. Statutory damages;

e. Nominal damages (in alternative);

f. Consequential and future damage for reasonable and necessary data monitoring services including data broker and dark web monitoring, as well as the cost of removing the disclosed data and profiles from data broker networks;

g. Restitution for the FMV of the misuse of the Private Information

h. Disgorgement of profits or cost savings derived from misuse of Plaintiffs' and Class Members' Private Information;

i. Injunctive relief to address the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

223. The injunctive relief sought includes:

a. Removal of the Tracking Tools from sensitive parts of the Website;

b. Deletion of all analytics data collected through the Tracking Tools that includes Private Information;

c. Deletion of all audience profiles and campaigns built data gathered from the Tracking Tools and build from Plaintiffs' and Class Member's Private Information;

d. Deletion of Plaintiffs' and Class Member data from all identifiable third-party broker lists;

e. Enjoinment from utilizing any of the Tracking Tools at issue in this matter in the future on any sensitive Website pages.

f. Enjoinment from utilizing any other tracking technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with the third parties.

g. Other relief as ordered by the Court.

**TOLLING**

224. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know (and had no way of knowing) that their PII and PHI was intercepted and unlawfully disclosed to Facebook and Google because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

225. Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Ohio Rules of Civil Procedure.

226. Class Definition: Plaintiffs bring this action on behalf of themselves and other similarly situated individuals defined as follows:

> **Ohio Class:** All individuals residing in Ohio who used Defendant's Website and had their Protected Health Information disclosed to Meta and Google.

227. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

228. Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

229. Numerosity, Civ.R. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed to Facebook and Google the Class is identifiable within Defendant's records.

230. Commonality, Civ.R. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

d. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

e. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

g. Whether Defendant's conduct violated the Ohio statutes identified herein.

h. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

i. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

231. Typicality, Civ.R. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of the Facebook Pixel, due to Defendant's misfeasance.

232. Adequacy, Civ.R. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that

is antagonistic or adverse to the Members of the Class and the infringement of the rights, and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

233. Superiority and Manageability, Civ.R. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

234. Policies Generally Applicable to the Class, Civ.R. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

235. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

236. The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

237. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

238. Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this First Amended Complaint.

239. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Ohio Rules of Civil Procedure.

240. Issue Certification, Civ.R. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

a. Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information;

b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I
## INVASION OF PRIVACY
**(*On behalf of Plaintiffs and the Class*)**

241. Plaintiffs incorporate the prior allegations as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

242. The Private Information of Plaintiffs and Class Members consist of private and confidential facts and information that were never intended to be shared beyond private communications.

243. Plaintiffs and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

244. Defendant owed a duty to Plaintiffs and Class Members to keep their Private Information confidential.

245. Defendant’s unauthorized disclosure of Plaintiffs’ and Class Members’ Private Information to Facebook and Google is highly offensive to a reasonable person.

246. Defendant’s willful and intentional disclosure of Plaintiffs’ and Class Members’ Private Information constitutes an intentional interference with Plaintiffs’ and the Class Members’ interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

247. Defendant’s conduct constitutes an intentional physical or sensory intrusion on Plaintiffs’ and Class Members’ privacy because Defendant facilitated Facebook’s and Google’s simultaneous eavesdropping and wiretapping of confidential communications.

248. Defendant failed to protect Plaintiffs’ and Class Members’ Private Information and acted knowingly when it installed the Tracking Tools onto its Website because the purpose of the Tracking Tools is to track and disseminate individual’s communications with the Website for the purpose of marketing and advertising.

249. Because Defendant intentionally and willfully incorporated the Tracking Tools into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

250. As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiffs and the Class Members was disclosed to a third party without authorization, causing Plaintiffs and the Class to suffer damages.

251. Plaintiffs, on behalf of herself and Class Members, seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

252. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still maintained by Defendant and still in the possession of Facebook and Google and the wrongful disclosure of the information cannot be undone.

253. Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook who on information and belief continues to possess and utilize that information.

254. Plaintiffs, on behalf of themselves and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
***(On behalf of Plaintiffs and the Class)***

255. Plaintiffs incorporate the prior allegations as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

256. Medical providers have a duty of confidentiality to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

257. As a fiduciary of the Private Information and medical provider, Defendant further owed Plaintiffs and Class Members a duty of loyalty that precluded the misuse and misappropriation of Plaintiffs' and Class Members Private Information.

258. In light of the special relationship between Defendant and Plaintiffs and Class Members, whereby Defendant became a guardian of Plaintiffs' and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiffs and Class Members: (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; and (2) to only use the information for the authorized purpose.

259. Plaintiffs and Class Members had reasonable expectations of privacy in their Private Information and the related confidential communications exchanged with Defendant through the Website.

260. Plaintiffs and Class Members also reasonably expected that their Privat Information would only be utilized for medical purposes.

261. Plaintiffs and Class Members did not provide consent for Defendant to appropriate or use their Private Information for commercial and digital marketing purposes.

262. Contrary to its duties as a fiduciary and medical provider and its express and implied promises of confidentiality, Defendant installed Tracking Tools with the intent and purpose to disclose and transmit Plaintiffs' and Class Members' Private Information to Google, Meta.

263. The unauthorized disclosures of Plaintiffs' and Class Members' Private Information were intentionally caused by Defendant's employees acting within the scope of their employment with the purpose of marketing for new patients. Alternatively, the disclosures of Plaintiffs' and Class Members' Private Information occurred because of Defendant's negligent hiring or supervision of its employees, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees to properly discharge their duties under existing privacy policies and procedures.

264. Defendant's breach of their fiduciary duties implied covenants of trust, loyalty, and confidence is evidenced by its failure to comply with federal and state privacy regulations, including:

a. Failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

c. Failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

d. Failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiffs' and Class Members PHI;

e. Impermissibly and improperly using and disclosing PHI for marketing in violation of 45 C.F.R. § 164.502, et seq.;

f. Failing to hire an expert to review the risk of data sets for re-identification and further failing to remove all digital identifiers from the data sets before disclosing the Private Information in violation of 45 C.F.R. § 160.103.

g. Failing to effectively train all members of its workforce, namely its digital marketing department and regulatory department on the policies and procedures with respect to PHI as necessary and appropriate for the members of its staff to carry out their responsibilities to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5);

h. Failing to keep Private Information confidential as required by N.Y. C.P.L.R. 4504;

i. Failing to keep Private Information confidential as required by N.Y. Pub. Health Law § 2803(3)(f); and

j. By otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

k. By otherwise misusing and unjustly profiting from Plaintiffs' and Class Members' Private Information.

265. As a direct and proximate result of Path's breach of fiduciary duty and confidentiality, Plaintiffs and Class Members have suffered numerous harms and injuries, including invasion of privacy, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of

privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

266. Consequently, Plaintiffs individually and on behalf of the putative Class, seek the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and in the alternative, nominal. Plaintiffs further seek restitution, disgorgement of profits or cost savings obtained from the improper use of the Private Information. Finally, Plaintiffs seek injunctive relief to address the ongoing breach of the fiduciary duty and financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
***(On behalf of Plaintiffs and the Class)***

267. Plaintiffs incorporate the prior allegations as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

268. As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiffs and the Class Members provided their Private Information.

269. When Plaintiffs and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information or use it for non-medical purposes without consent.

270. Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to maintain the confidentiality and limited scope of use.

271. Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information to the Un-authorized Third-Party Marketers without consent.

272. Defendant further breach the implied contracts by using Plaintiffs and Class Member Private Information without consent.

273. As a direct and proximate result of Defendant's breach of these implied contracts, Plaintiffs and Class Members sustained numerous injuries including but not limited to the loss of the benefit of their bargain, invasion of privacy, loss of control of their Private Information, misappropriation and misuse of their Private Information, breach of confidentiality, conversion, and the ongoing financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

274. Consequently, Plaintiffs, individually and on behalf of the putative Class seeks legal and equitable remedies to address and rectify the breach of implied contract described herein including compensatory and consequential damages, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and in the alternative nominal damages. Plaintiffs further seek restitution, and disgorgement of profits or cost savings obtained from breach and the improper use of the Private Information. Finally, Plaintiffs seek injunctive relief to prevent the ongoing disclosure, interception, and continued misuse of the Private Information.

**COUNT IV**
**UNJUST ENRICHMENT**
***(On behalf of Plaintiffs and the Class)***

275. Plaintiffs incorporate the prior allegations as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

276. Defendant benefits from the use of Plaintiffs' and Class Members' Private Information and unjustly retained those benefits at their expense.

277. Plaintiffs and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

278. Defendant exceeded any authorization given and instead consciously disclosed, misappropriated, and misused the Private Information for marketing and its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary savings and revenue.

279. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members for the use of the Private Information.

280. The financial benefits that Defendant derived from Plaintiffs and Class Members was not offered by Plaintiffs and Class Members gratuitously and rightly belong to Plaintiffs and Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the savings, profit or other financial benefits wrongly derived from the misappropriation and misuse of Plaintiffs' and Class Members' Private Information as alleged in this Complaint.

281. Consequently, due to the unjust nature of Defendant's actions and the injuries and damages sustained by Plaintiffs and the Class, Defendant should be compelled to provide to disgorge into a common fund all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper. These equitable funds can be evenly allocated among the Plaintiffs and Class Members on a pro-rata basis.

282. Alternatively, Defendant should be compelled to provide restitution to Plaintiffs and Class for the fair market value of the Private Information that Defendant misappropriated and misused for marketing purposes without consent.

283. Furthermore, Plaintiffs seeks injunctive relief to prevent the imminent financial and privacy harms arising from the ongoing disclosure, interception, and misuse Plaintiffs' and Class Member's Private Information.

**COUNT V**
**INTERCEPTION AND DISCLOSURE OF ELECTRONIC COMMUNICATIONS**
**VIOLATION OF OHIO R.C. 2933.51**
***(On behalf of Plaintiffs and the Ohio Class)***

284. Plaintiffs incorporate the prior allegations as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

285. Plaintiffs bring this claim on behalf of himself and all members of the Class.

286. Defendant qualifies as a person under the statute.

287. R.C. 2933.52(B)(4) provides that it is unlawful for a person not acting under law to intercept an electronic communication "for the purpose of committing a criminal offense or tortious act in violation of the laws or Constitution of the United States or this state for the purpose of committing any other injurious act."

288. Defendant intercepted Plaintiffs' and Class Members' electronic communications for the purpose of committing multiple tortious and criminal acts, including, but not limited to, the violations of statutes, regulations, and common law identified in the ECPA claim above.

289. Any person whose wire, oral, or electronic communications are intercepted, disclosed, or intentionally used in violation of the Wiretap Act may bring a civil action to recover from the person or entity that engaged in the violation. R.C. 2933.65.

290. Defendant violated the Ohio Wiretap Act by intercepting Plaintiffs' and Class Members' electronic communications in violation of R.C. 2933.52(A)(1).

291. Defendant separately violated the Ohio Wiretap Act by using the contents of a Plaintiffs' and Class Members' electronic communications, knowing or having reason to know, that the contents were obtained through the interception of an electronic communication in violation of R.C. 2933.52(A)(3). Specifically, Defendant knowingly used the contents of Plaintiffs' and Class Members' electronic communications to barter and/or sell that information to third parties like Meta and Google in return for access to the Tracking Tools.

292. Ohio law defines "electronic communications" to mean "the transfer of a sign, signal, writing, image, sound, datum, or intelligence of any nature that is transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system." R.C. 2933.51(N). Plaintiffs' and Class Members' communications with Defendant constitute "electronic communications" under Ohio law because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

293. Defendant engaged in and continues to engage in interception by aiding others (including Facebook and Google) to secretly record and disclose the contents of Plaintiffs' and Class Members' wire communications.

294. The intercepting devices used in this case include, but are not limited to

a. Plaintiffs' and Class Members' personal computing devices;

b. Plaintiffs' and Class Members' web browsers;

c. Plaintiffs' and Class Members' browser-managed files;

d. The Tracking Tools;

e. Facebook's Meta Pixel;

f. Internet cookies;

g. Defendant's computer servers;

h. Third-party source code utilized by Defendant; and

i. Computer servers of third parties (including Facebook) to which Plaintiffs and Class Members' communications were disclosed.

295. "Contents" under the Act, when used with respect to any electronic communication, includes "any information concerning the substance, purport, or meaning of the communication." R.C. 2933.51(G).

296. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

297. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. PII such as patients' IP addresses, Facebook IDs, Google IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

h. The precise text of patient communications about locations and physicians/therapists they treated with;

i. The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. The precise dates and times when patients click to Log-In on Defendant's Website(s);

k. The precise dates and times when patients visit Defendant's Websites;

l. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

298. Plaintiffs and Class Members reasonably expected that their Private Information was not being intercepted, recorded, and disclosed to Facebook or other third-party advertising companies.

299. No legitimate purpose was served by Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' Private Information to Facebook and similar third-party advertising companies. Neither Plaintiffs nor Class Members consented to the disclosure of their Private Information by Defendant to these third parties. Nor could they have consented, given that



E-FILED 07/01/2026 9:44 AM / CONFIRMATION 1846100 / A 2603513 / COMMON PLEAS DIVISION / IFIJ

Defendant never sought Plaintiffs' or Class Members' consent, or even told visitors to its website that their every interaction was being recorded and transmitted to Facebook and other third parties via Tracking Tools so that these third parties could monetize their Private Information.

300. Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their PHI to develop marketing and advertising strategies.

301. Under the Wiretapping Act, all aggrieved persons are entitled to recover actual damages, but not less than liquidated damages computed at the rate of one hundred dollars a day for each day of the violation or ten thousand dollars ($10,000,000), whichever is greater, punitive damages, and reasonable attorney's fees and other litigation costs. R.C. 2933.65.

302. Plaintiffs and Class Members have, and will continue to, suffer irreparable injury from Defendant's unauthorized acts of disclosure. Their personal, private, and sensitive data has been collected, viewed, accessed, stored, and used by Defendant and Facebook and other third parties without their consent and has not been destroyed. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiffs continue to desire to search for health information on Defendant's website.

303. Plaintiffs will continue to suffer harm if the website is not redesigned. If the website were redesigned to comply with applicable laws, Plaintiffs would use Defendant's website to search for health information in the future. Due to the continuing threat of injury, Plaintiffs and Class Members have no adequate remedy at law, and Plaintiffs and Class Members are therefore entitled to injunctive relief.

304. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT_VI**
**BREACH OF CONFIDENCE**
**(*Biddle Claim*)**
***(On Behalf of Plaintiffs and the Ohio Class)***

305. Plaintiffs incorporate all prior allegations as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

306. Medical providers in Ohio have a duty to their patients to keep Private Information confidential and to not disclose Private Information to third parties without the patient's informed consent or other applicable legal privilege entitling them to do so.

307. Plaintiffs and Class Members had reasonable expectations of privacy when interacting with Defendant through the Website, including communications made on the Website, in virtue of this well-known duty of confidentiality incumbent upon medical providers.

308. Contrary to its duty as a medical provider, Defendant deployed the Tracking Tools to secretly record and transmit nonpublic Private Information to third parties as described throughout this First Amended Complaint without patient authorization or consent.

309. The Private Information that Defendant transmitted to third parties without authorization was learned within a physician-patient relationship.

310. Defendant's breaches of confidence were committed negligently, recklessly, and/or intentionally.

311. Defendant's breaches of confidence were a direct and proximate cause of several injuries suffered by Plaintiffs and Class Members, including, but not limited to, losses of privacy, interference with confidential relationships, and diminished value of Private Information. Plaintiffs and Class Members seek compensatory damages in an amount to be proved at trial. In the alternative, Plaintiffs and Class Members seek nominal damages.

**COUNT VII**
**CIVIL LIABILITY FOR CRIMINAL ACTIONS**
**(R.C. 2307.60, et seq.)**
***(On behalf of Plaintiffs and Ohio Class Members)***

312. Plaintiffs incorporate the prior allegations as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

313. Defendant's conduct as described throughout this Complaint violated 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly "disclosing individually identifiable health information" ("IIHI") to a third party.

314. 42 U.S.C. § 1320d(6) defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

315. Defendant intentionally used the Tracking Tools to transmit IIHI to unauthorized third parties for commercial purposes without Plaintiffs' and Class Members' knowledge or consent. Plaintiffs' and Class Members' IIHI was then used by third parties to target Plaintiffs and Class Members with particular advertising associated with their particular health conditions.

316. As described above, Defendant obtained a commercial benefit from its transmission of the IIHI. In other words, Defendant intended to sell, transfer, or use Plaintiffs' and Class Members' IIHI for personal gain.

317. This conduct was unknown to Plaintiffs and Class Members, who lack direct access to what occurs in the background of Defendant's Website.

318. Plaintiffs and Class Members have been injured by Defendant's criminal violations of 42 U.S.C. § 1320d-6(a)(3).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of himself and Class Members, requests judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class and appointing Plaintiffs and Counsel to represent such Class;

B. For an award of damages, including, but not limited to, past and future compensatory, actual, consequential, statutory, and nominal damages, as allowed by law in an amount to be determined;

C. For equitable relief in the form of restitution and disgorgement of profits;

D. For injunctive relief requested by Plaintiffs, including, but not limited to:

i. Removal of the Tracking Tools from sensitive parts of the Website;

ii. Deletion of all analytics data collected through the Tracking Tools;

iii. Deletion of all audience profiles and campaigns built utilizing data gathered from the Tracking Tools;

iv. Deletion of Plaintiffs' and Class Member data from all identifiable third-party broker lists;

v. Enjoinment from utilizing any of the Tracking Tools at issue in this matter in the future.

vi. Enjoinment from utilizing any other tracking technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with the third parties.

vii. Other injunctive relief as ordered by the Court.

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand that this matter be tried before a jury.

DATE: July 1, 2026

Respectfully Submitted,

/s/ *Joseph M. Lyon*
Joseph M. Lyon (0076050)
Clint C. Watson (0078378)
Kevin M. Cox (0099584)
**THE LYON FIRM, ALC**
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone: (513) 381-2333
*jlyon@thelyonfirm.com*
*cwatson@thelyonfirm.com*
*kcox@thelyonfirm.com*

Gary M. Klinger*
Alex Honneycut*
Arlene L. Boruchowitz (0096747)
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
*gklinger@milberg.com*
*ahoneycutt@milberg.com*
*aboruchowitz@milberg.com*

Leanna A. Loginov*
Alexandra Mormile*
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
E: lloginov@shamisgentile.com
E: amormile@shamisgentile.com

***Counsel for Plaintiffs and the Putative Class***
* *pro hac vice* forthcoming